# EXHIBIT E

## TO PLAINTIFFS' P.R. 4-5(c) REPLY BRIEF REGARDING CLAIM CONSTRUCTION

```
00001
 1                        IMPORTANT NOTICE

 2      ***PLEASE READ BEFORE USING REALTIME ROUGH DRAFT***

 3

 4                     AGREEMENT OF PARTIES
                 WORKING WITH REALTIME ROUGH DRAFTS
 5
             We, the party working with realtime and rough
 6      draft transcripts, understand that if we choose to use
        the realtime rough draft screen, or the printout, that
 7      we are doing so with the understanding that the rough
        draft is an uncertified copy.
 8
             We further agree not to share, give, copy,
 9      scan, fax, or in any way distribute this realtime
        rough draft in any form (written or computerized) to
10      any party.  However, our own experts, co-counsel and
        staff may have limited internal use of same with the
11      understanding that we agree to destroy our realtime
        rough draft and/or any computerized form, if any, and
12      replace it with the final transcript upon its
        completion.
13
        CASE:     IP INNOVATION LLC V. GOOGLE INC.
14
        WITNESS:  JOCK MACKINLAY
15
        DATE:     August 27, 2009
16
                          REPORTER'S NOTE:
17
             Since this deposition has been realtimed and is
18      in rough draft form, please be aware that there may be
        a discrepancy regarding page and line number when
19      comparing the realtime screen, the rough draft, rough
        draft disk, and the final transcript.
20
             Also please be aware that the realtime screen
21      and the uncertified rough draft transcript may contain
        untranslated steno, reporter's notes in brackets,
22      misspelled proper names, incorrect or missing Q/A
        symbols or punctuation, and/or nonsensical English
23      word combinations.  All such entries will be corrected
        on the final, certified transcript.
24
        MARK HOVILA, CSR, CM
25      Court Reporter
```

```
00052
 1      A.    I don't understand your question.
 2      Q.    To accomplish the scene shift from figure 2A
 3   to 2B, would you have to do a combination of pressing
 4   the space bar and the space bar and the left Alt key
 5   to request both motion toward the card and lateral
 6   motion?
 7      A.    Well, if you're getting at exactly how I
 8   reduced this to practice, I can't completely recall.
 9   If you're asking a general question about the
10   invention, the basic idea of the invention was you'd
11   point to the point of interest and you'd indicate that
12   you wanted to move forward towards it, and in this
13   particular instance, 2A to 2B there would be both a
14   movement towards the point and a lateral movement as
15   well.  So the invention, you could have, it could have
16   been possible to make a single request and gotten that
17   full experience.  And in fact, I would say, although I
18   can't recall in particular, that particular form I
19   reduced to practice precisely, which is that a single
20   press of the key did both movement forward and also
21   lateral movement at the same time.  And I would say
22   that given the description I read on page 16, anyone
23   skilled in the art would have been able to imagine
24   that particular way of doing it.
25      Q.    When it says in the column 16 that if both
```

```
00109
 1        Q.    And I believe before the break you told me
 2   that you had created an implementation of the
 3   invention where you could request a combination of
 4   movement toward the POI and lateral motion.  Is that
 5   right?
 6        A.    Yes.
 7        Q.    And I think that you said you had an
 8   implementation where you could do that with one
 9   button.  Is that right?  Or have I misunderstood?
10        A.    Well, I can't remember the implementation,
11   but my recollection is that since it was very useful,
12   yeah, we had a -- we had an implementation where it
13   was just one button that went both forward and forward
14   and laterally at the same time.  But I could be wrong.
15   It certainly was within the scope of what we thought
16   we were doing.  When you first implement something
17   like this, you have lots of controls that give you
18   access to different aspects of the behavior.  Later on
19   as you use it, you figure out what experience is
20   really right, and of course you reduce the controls
21   down to the just the ones that are most useful for
22   you.  So at the time of the reduction to practice may
23   have not had that, but certainly later on when we
24   wanted to go both forward and laterally, we probably
25   did it.  I can't remember for sure.
```

```
00111
 1  same time.  I mean, somebody reading this would have
 2  understood that that was part of it.  That was
 3  certainly what we thought.
 4      Q.    So is your testimony that someone skilled in
 5  the art reading this patent at the time you filed for
 6  it would have understood that the invention could be
 7  used to do forward and lateral motion at the same time
 8  using a single --
 9      A.    Control.
10      Q.    Control?
11      A.    Yeah, I think so.  That certainly was our
12  intent.
13      Q.    And it is correct, though, that that's not,
14  you don't in the patent explain how to do that?
15            MR. MAHALEK:  Objection.
16      A.    Well, I certainly am not going to -- I think
17  it's explained in the patent.
18      Q.    Can you show us where?
19      A.    No, I think -- I'll invoke the figure.  I
20  think that figures 2A and 2B actually describe moving
21  forward and laterally at the same time.  And the
22  particulars, the particulars of what key you press, it
23  just, you know, is, everyone knew how to press keys in
24  those days.  So that part is just part of the art.
25  But the notion that you would actually press a key and
```