# EXHIBIT B

1            ROUGH DRAFT TRANSCRIPT OF THE

2            DEPOSITION OF CHRISTOPHER SMITH

3                 January 15, 2010

4

5          This transcript is a rough draft only,

6    not certified in any way, and, therefore, may not

7    be quoted in any pleading or for any other purpose,

8    and may not be filed with any court.

9          All parties receiving this rough-draft

10   transcript agree that it will not be shared, given,

11   copied, scanned, faxed, e-mailed, or in any way

12   distributed in any form by any party to anyone

13   except their own experts, co-counsel, or staff, and

14   agree to destroy this rough draft in any form and

15   replace it with the final certified transcript upon

16   its completion.

17         Please be aware that there will be

18   discrepancies as to page and line numbers when

19   comparing the rough-draft transcript and the final

20   transcript, and that the rough-draft transcript may

21   contain untranslated steno, incorrect punctuation,

22   and/or nonsensical English word combinations.  All

23   such entries will be corrected on the final

24   transcript.

25                      * * *

        COMPUTER UNCERTIFIED ROUGH-DRAFT TRANSCRIPT ONLY
☐
                                                      2

1              THE VIDEOGRAPHER:  My name is Jonas

2  Hinckley of LNS court reporting.  The date today

3  the January 15, 2010, and the time is approximately

4  9:01 a.m.  This deposition is being held in the

5  office of Tonkon Torp, LLP, located at 888 S.W.

6  Fifth Avenue, Suite 1600, Portland, Oregon 97204.

7  The caption of this case is case number

8  207CV503RRR, IP Innovation LLC and Technology

9  Licensing Corps versus Google, Incorporated, in the

10  U.S. District Court for the Eastern District of

11  Texas, Marshal Decision.  The name of the witness

12  is Chris Smith.

13         At this time the attorneys will identify

14  themselves and the parties they represent.  After

15  which our court reporter, Rosemary Tanzer with LNS

16  Court Reporting, will swear in the witness and we

17  can proceed.

18         MS. LEE:  Anna Lee with WilmerHale

19  for Google.

20         MS. INGRAM:  Kristin Ingram,

21  attorney for Xerox Corporation.

22

23         CHRISTOPHER SMITH

24     having first been sworn by the reporter to

25  tell the truth, testified under oath as follows:

   COMPUTER UNCERTIFIED ROUGH-DRAFT TRANSCRIPT ONLY

                                                3

1              EXAMINATION

2  BY MS. LEE:

3  Q    Mr. Smith, good morning.

4  A    Good morning.

5  Q    My name is Anna Lee and I'm from the law firm
6  of WilmerHale.  My firm represents the defendant
7  Google in the patent litigation lawsuit brought by
8  the plaintiffs IP Innovation, LLC, and Technology
9  Licensing Corporation.  Can you please state your
10 full name for the record?
11 A    Christopher P. Smith.
12 Q    And what is your home address?
13 A    2343 N.W. Pettygrove Street, Portland, Oregon,
14 97210.
15 Q    Have you testified before?
16 A    I don't believe so.
17 Q    Have you ever been -- do you recall ever being
18 deposed before?
19 A    Definitely never been deposed.
20 Q    So I'm going to go through some ground rules
21 here.  I'm going to be asking you a series of
22 questions.  I'll ask that you answer those
23 questions truthfully and to the best of your
24 ability.  There is a court reporter that's going to
25 be typing everything that you say here today, and

         COMPUTER UNCERTIFIED ROUGH-DRAFT TRANSCRIPT ONLY
☐
                                              4


1  this will result in a transcript.
2            Now it's important that you understand
3  the questions that I ask and that you give an
4  accurate answer.  If at any time you don't
5  understand a question, please let me know and I'll
6  try to clarify for you.  If you answer, I'll assume
7  that you've understood the question.  And if there

8  is anything you don't know or aren't sure of,

9  please let us know.

10      I ask that you give verbal answers to my

11  questions, so the court reporter can write

12  everything down.  So please don't use nonverbal

13  gestures or uh-huh or nodding your head.  Please

14  allow me to finish answering my questions before

15  answering, and I will allow you to finish answering

16  before I ask you the next question.  Should you

17  need a brief break, please let us know.  After any

18  pending questions are answered you can then take a

19  break.

20      Now, you understand that your testimony

21  today here is under oath, just as if you were in

22  the courtroom, and that the court reporter is

23  taking down, verbatim, the testimony that you're

24  about to give?

25  A    Yes.

COMPUTER UNCERTIFIED ROUGH-DRAFT TRANSCRIPT ONLY

1  Q    Do you have any questions about the procedures

2  that we're going to follow today?

3  A    No.

4  Q    And are you represented by counsel today?

5  A    I am.

6  Q    Can you identify that counsel?

7  A    Kristin Ingram.

8  Q    Is she with Xerox?

9  A    She's with Xerox, yes.

10  Q    Mr. Smith, can you please briefly describe

11  your education after high school?

12  A    Sure.  I have a bachelor of science from

13  Rensselaer Polytechnic in computer systems

14  engineering and I have a master's of business

15  administration from Boston University.

16  Q    And when did you receive your bachelor's of

17  science?

18  A    In 1982.

19  Q    And when did you receive your master's in

20  business administration?

21  A    1987.

22  Q    Do you hold any other professional

23  designations or licenses?

24  A    No.

25  Q    Mr. Smith, you are currently employed?

        COMPUTER UNCERTIFIED ROUGH-DRAFT TRANSCRIPT ONLY

                                                    6

 1  A    Yes, I am.

 2  Q    And who is your current employer?

 3  A    Xerox Corporation.

 4  Q    How long have you worked at Xerox?

 5  A    Depending on how you count acquisitions, I

 6  have a little bit over 25 years of service.

 7  Q    Let's start with your current position going

 8  backwards.  So can you tell us what your current

 9  position is?

10  A    Sure.  I'm an Internet technologist in the

11  Internet marketing group.

12  Q    What is that?  Can you explain a little what

13  that means?

14  A    Essentially I'm one of the key architects for

15  the software that drives the product information

16  section of the Xerox.com website.

17  Q    How long have you held this position?

18  A    I've been doing Internet marketing for a

19  combination of Techtronix and then Xerox in some

20  form since 1995.

21  Q    And you mentioned a company, Techtronix?

22  A    Yes.

23  Q    Was that a company that you previously worked

24  at?

25  A    Yes.  In 2000 Xerox purchased the color

COMPUTER UNCERTIFIED ROUGH-DRAFT TRANSCRIPT ONLY

☐                                                    7

1   printer division of Techtronix, which I was

2   employed by.

3   Q    How long were you employed with Techtronix?

4   A    I became a Techtronix employee in 1988, I

5   believe.  I was previously employed with a company

6   that they had purchased.

7   Q    And how long did you hold your current

8   position?  How long have you held that Internet

9   technologists position for?

10  A    Well, the job has evolved somewhat, but the

11  current -- I would say the current position

12  primarily dates from 2000 after the acquisition.

13  Q    Can you explain to us a little bit more about

14  your duties and responsibilities?  I know you

15  explained generally what your title means, but what

16  do you do on a day-to-day basis?

17  A    On a day-to-day basis I'm part of a team that

18  both constructs the software that operates the

19  website and then provides the content that

20  populates the website.  My role is principally in

21  high-level design of the software.

22  Q    And you said that you started this position on

23  or about 2000?

24  A    Right.

25  Q    Is that right?

        COMPUTER UNCERTIFIED ROUGH-DRAFT TRANSCRIPT ONLY
□
                                                        8


1   A    Uh-huh.

2   Q    And what was your position prior to that?

3   A    Prior to that I had been the director of

4   Internet marketing for both Techtronix and then --

5   or Techtronix color printer division, and then for

6   the office printing business within Xerox after we

7   were purchased.  In 2000 I stepped down from the

8   management role into an more individual contributor

9   position.

10            (Reporter clarification)

11  A    Into an individual contributor position.

12  Q    And did you hold any positions prior to that?

13  So we're going backwards here.

14  A    Right.  So in the early '90s I had been the

15  manager of direct marketing for the color printing

16  division of Techtronix.  The Internet work was

17  originally put in the direct marketing department

18  and then, of course, grew into its own department.

19  Prior to that I had been a product manager for

20  Techtronix.

21  Q    And was that your first position when you

22  entered Techtronix as a product manager or did you

23  have any position prior to that?

24  A    In 1988, when I first became a Techtronix

25  employee, I was a marketing manager in the

       COMPUTER UNCERTIFIED ROUGH-DRAFT TRANSCRIPT ONLY

                                                    9


 1  computer -- what was the title -- computer system

 2  engineering division.

 3  Q    So that was your first position when you

 4  started Techtronix?

 5  A    After the acquisition of the company I was

 6  working for, yes.

 7  Q    What was the company that you were working for

 8  when Techtronix was acquired?

 9  A    It was called CA Systems, and I was an

10  applications engineer in the Boston field office.

11  Q    Was that the first position that you acquired

12  after graduating from -- getting your undergrad or

13  graduate degree?

14  A    That was my second position.  My first

15  position was as a computer hardware designer for a

16  company called IPL Systems in the Boston area.

17  Q    How long were you working there?

18  A    Two or three years.

19  Q    Thank you.  In a moment I'm going to hand you

20  what I'm going to ask the court reporter to mark as

21  Exhibit 1.  This document bears production numbers

22  GGL-0002393 through 94.  Mr. Smith, have you seen

23   this document before?

24                    (Exhibit No. 1 marked.)

25   A     I have.

        COMPUTER UNCERTIFIED ROUGH-DRAFT TRANSCRIPT ONLY

 ▯                                                          10


 1   Q     Can you tell us what it is?

 2   A     I believe it is a case study on the Google

 3   website describing the purchase by Techtronix of a

 4   Google Search Appliance -- or I'm sorry, by Xerox

 5   of a Google Search Appliance.

 6                    (Reporter clarification)

 7   A     Search appliance.

 8   Q     Now, if you can look at the third paragraph on

 9   this page -- in the first page.  Towards the end of

10   this sentence do you see where it says, "'Chris

11   Smith, lead Internet technologist for the Office

12   Group at Xerox'"?

13   A     Uh-huh.

14   Q     Do you understand that to be you?

15   A     Yes.

16   Q     Now, can you please tell me how you came to be

17   mentioned in this document?

18   A     We had purchased the Google Search Appliance.

19   My recollection is I was contacted from someone at

20   marketing at Google who asked if they could do a

21   case study.  I then sought approval from Xerox

22   public relations, which they granted.

23   Q     Do you recall who it was at Google's marketing

24   department that had contacted you?

25   A     I don't.

                              Page 9

1  Q    Do you recall when they had contacted you?

2  A    I know that the product we purchased was

3  introduced sometime around 2004, so it was roughly

4  in that time frame.  But other than that, I have no

5  specific recollection.

6  Q    And why did you agree to talk to this

7  marketing person at Google?

8  A    I think, in general, Xerox likes being

9  portrayed as a leader in technology.  So embracing

10  something new and different to solve a problem is

11  the general interest of Xerox branding.

12  Q    And did this conversation occur via -- was it

13  via telephone?  Was it an in-person meeting when

14  you met with this Google marketing person that

15  contacted you?

16  A    I'm sure it was not an in-person meeting.

17  Whether it was e-mail or phone, I have no

18  recollection.

19  Q    Do you remember if this was a series of

20  exchanges that occurred between you and this person

21  at Google or was this a one-time conversation that

22  occurred?

23  A    I'm sure it would have been several

24  conversations.

25  Q    Do you recall how many conversations that

1  might have been?

2  A    I don't.

3  Q    Do you think it would expand over a period of

4  weeks?

5  A    Something like this could not happen faster

6  than that, I'm sure.

7  Q    Now, if I can have you look at paragraph four

8  starting with, quote, "'I evaluated other search

9  solutions.'"  Do you see that?

10 A    Yes, I do.

11 Q    Did you make that statement?

12 A    Yes.

13 Q    Can you explain why you were looking at search

14 solutions at the time?

15 A    Yes.  When we were -- at that time my

16 responsibilities included both the external Xerox

17 website portions of it and an internal intranet

18 site used by sales and marketing employees within

19 our division.  And when we left Techtronix, we had

20 brought a portion of that intranet with us.  At the

21 time we could no longer use the search solution

22 that Techtronix had for their internal website

23 because we had separated, so we were looking for a

24 new search tool for that site.

25 Q    Do you recall what other search solutions that

    COMPUTER UNCERTIFIED ROUGH-DRAFT TRANSCRIPT ONLY

□
                                        13


1  you evaluated at the time?

2  A    I believe, specifically, we were using Verity

3  Software for some other search applications and

4  evaluated it for this application, as well.

5  Q    So you evaluated Verity, apparently, Google

6  Search Appliance.  Do you recall evaluating other

7  search solutions?

8  A    There may have been other software solutions.

9  I don't specifically recall.

10  Q    If you could look at the next sentence where

11  it says, "'They were expensive, involved a great

12  deal of IT configuration time and ongoing

13  maintenance, and required us to find a server to

14  host it on.'"  Do you see that?

15  A    Yes.

16  Q    Do you recall making that statement?

17  A    Yes.

18  Q    Do you believe this to be an accurate

19  statement when you made it?

20  A    I do.

21  Q    Let's take a look at the next sentence.  It

22  says, "'We had a very small budget to work with,

23  and I needed to find an inexpensive solution that

24  didn't require a lot of effort.'"  Do you see that?

25  A    Yes.

COMPUTER UNCERTIFIED ROUGH-DRAFT TRANSCRIPT ONLY

1  Q    Did you make that statement?

2  A    Yes, I did.

3  Q    And can you tell us how you learned about

4  Google Search Appliance?

5  A    I don't recall, specifically.

6  Q    Do you believe that someone at Xerox brought

7  it to your attention?  Do you recall --

8  A    More likely it was a trade publication or some

9  kind of news.

10  Q    You do recall if you were the one that went

11  out and sought to test the Google Search Appliance

12  product and reached out to Google to potentially

13  acquire it, inhouse?

14  A    Yes, I was.

15  Q    Was there anyone else that was working with

16  you at the time on this project?

17  A    There would have been other people involved

18  from either the IT department, possibly one of my

19  colleagues in the Internet group, who would have

20  evaluated the applicability of this solution.

21  Q    Are any of those colleagues still working with

22  you today?

23  A    Potentially one.  I honestly don't remember if

24  he was specifically involved.  He may have been.

25  Q    Do you recall the name of this other person

COMPUTER UNCERTIFIED ROUGH-DRAFT TRANSCRIPT ONLY

1  that worked with you?

2  A    His name was Jim Canan, C-A-N-A-N.

3  Q    So Mr. Smith, did you conclude that, at the

4  end of your search for various search solutions,

5  that Google Search Appliance was expensive or

6  inexpensive compared to the other solutions that

7  you were looking at?

8  A    My general recollection is that it compared to

9   acquiring a software solution, and that the

10   internal time to configure it and locating a

11   hardware server to put it on, the price point was

12   very appealing.

13   Q    Do you recall if there were any other

14   contenders at the time or if Google Search

15   Appliance stood out as the product that you were

16   interested in choosing?

17   A    Again, all the other possibilities were

18   software solutions.

19   Q    What -- after looking at the variance search

20   solutions, what did you conclude about the effort

21   that Google Search Appliance required compared to

22   the others, if you can go through that?

23   A    The major benefit that I perceived at the time

24   was that it would require relatively little

25   configuration.  So we wouldn't be spending a lot of

COMPUTER UNCERTIFIED ROUGH-DRAFT TRANSCRIPT ONLY

☐

1   internal resources on either setting it up or

2   maintaining it.

3   Q    Were there any other benefits that stood out

4   to you?

5   A    I don't remember the specific cost comparisons

6   between the software licenses and the appliance,

7   but they must have been reasonably favorable.

8   Q    If I can turn your attention to the sixth

9   paragraph, which is the last full paragraph in that

10   first page.  Do you see the sentence where it

11   starts with, "'Google had it all'"?

12  A    Uh-huh.

13  Q    Did you make this statement?

14  A    Yes, I did.

15  Q    And if you can look at the next sentence where

16  it says, it was expensive -- "'It was inexpensive

17  and easy to use.'"  Do you see that?

18  A    Yes.

19  Q    And did you make that statement?

20  A    Yes.

21  Q    Do you believe it to be an accurate statement

22  when you made it?

23  A    I do.

24  Q    If you can look at the next sentence where it

25  says, "'I spent about half a day going through our

COMPUTER UNCERTIFIED ROUGH-DRAFT TRANSCRIPT ONLY

1   document collection and the other half tweaking the

2   look and feel of the search pages to match the

3   Xerox brand.'"  Do you see that?

4   A    Yes.

5   Q    And did you make this statement?

6   A    Yes, I did.

7   Q    If you can look at the next sentence where it

8   says, "He used the Page Layout Wizard to cut and

9   paste HTML from their existing templates."  Do you

10  see that?

11  A    Yes.

12  Q    Did you do what is described in this sentence?

13  A    I know that we cut and paste HTMLs from our

14  existing templates.  I don't specifically remember

15  using the Page Layout Wizard to do so.

16  Q    Was this document presented to you at the time

17  that you made these statements?

18  A    I don't have a specific recollection, but

19  certainly our corporate PR would have -- or our

20  division PR, I don't remember, one of the PR groups

21  would have signed this off and I would have been

22  part of that process.

23  Q    So if at the time they presented this document

24  to you and it said that you used this Page Layout

25  Wizard to cut and paste the HTMLs into your

COMPUTER UNCERTIFIED ROUGH-DRAFT TRANSCRIPT ONLY

☐                                                        18


1   existing templates, would you have any reason to

2   believe know that that would be an inaccurate

3   statement?

4   A    No.

5   Q    Because at the time you would have -- if you

6   saw this statement and it was inaccurate, you

7   wouldn't have let it go to print.  Is that correct?

8   A    Correct.

9   Q    Now, if you can look at the next two sentences

10  where it says, "'That's all it took to get up and

11  running.  It simply worked right out of the box.'"

12  Do you see that?

13  A    Yes.

14  Q    And did you make this statement?

15  A    Yes.

16  Q    Did you believe it to be an accurate statement

17  when you made it?

18  A    Yes.

19  Q    And did GSA, Google Search Appliance, in fact

20  work right out of the box?

21  A    It did.

22  Q    Now, if you can turn to the paragraph that

23  begins at the bottom of the first page, continues

24  at the top of the second page.  Do you see where it

25  says, "Smith was also pleased that," and then it

COMPUTER UNCERTIFIED ROUGH-DRAFT TRANSCRIPT ONLY

                                                    19

 1  has another quotation from you.  It reads, "'Our

 2  employees were already comfortable using Google for

 3  web search.  We simply put the search box in the

 4  corner of the web page and let the team have at

 5  it.'"  Did you make these statements?

 6  A    Yes, I did.

 7  Q    Do you believe them to be accurate when you

 8  made them?

 9  A    Yes.

10  Q    Was it, in fact, true that Google Search

11  Appliance required no real user training?

12  A    That's correct.

13  Q    Now, if you can look at the paragraph that

14  begins after the heading, end result.  Do you see

15  the quotation attributable to you where it reads,

16  "'The best overall benefit is that there is no

17  ongoing maintenance.  We've never had to call for

18  support because we've never had any problems.

19  That's been a huge win for us.'"

20  A    Yes.

21  Q    Did you make these statements?

22  A    I did.

23  Q    And do you believe them to be accurate when

24  you made them?

25  A    I do.  I would qualify that I believe I was

        COMPUTER UNCERTIFIED ROUGH-DRAFT TRANSCRIPT ONLY

□                                                       20


 1  using the word maintenance in the sense of ongoing

 2  activities to maintain it.  There is actually a

 3  maintenance contract with Google, that essentially

 4  buying a new appliance every two years, I believe,

 5  as part of that.

 6  Q    So when you made this statement, was it -- was

 7  it true that you never really had to call for

 8  support because you didn't have problems with

 9  Google Search Appliance?

10  A    At that time it was correct.  I believe we may

11  have actually had one appliance at some point that

12  crashed and had to be replaced.  But at the time I

13  gave this quote, that was certainly true.

14  Q    And at this paragraph it says that Google

15  Search Appliance was installed about April 2002.

16  Is that correct?

17  A    I don't have a specific recollection, but I

18  have no information to disagree with that.

19  Q    So let me direct your attention to the end of

20  the paragraph, of that same paragraph that we're

21  looking at.  Do you see that there is another

22  quotation attributed to you which reads, "'Since we

23  started using the Google Search Appliance,' says

24  Smith, 'the sales force is able to find what

25  they're looking for and we've stopped receiving


    COMPUTER UNCERTIFIED ROUGH-DRAFT TRANSCRIPT ONLY
▯
                                                    21


 1  complaints.'"  Did you make this statement?

 2  A     I did.

 3  Q     Did you believe it to be accurate when you

 4  made it?

 5  A     Yes.

 6  Q     After installation of the Google Search

 7  Appliance, was the sales force, in fact, able to

 8  find what they were looking for with this product?

 9  A     Well, as I said before, they stopped

10  complaining.  It was a large source of complaint

11  prior to that.

12  Q     Do you recall why they were receiving

13  complaints about --

14  A     The documents involved were essentially sales

15  collateral documents, so their ability to find the

16  right one quickly was important to their

17  productivity.

18  Q     And after installation, as your quote says,

19  you stopped receiving complaints.

20  A     Right.

21  Q     Let's turn back to the first page.  At the

22  bottom right-hand corner, do you see the word

23  "benefit"?  Under that there is a quote attributed

24  to you that continues on top of the right-hand

25  corner of the next page.  It reads, "'We used to

1  have a lot of complaints from our sales force that
2  they weren't able to find crucial documents on our
3  intranet.  Since we started using Google Search
4  Appliance, the sales force is able to find what
5  they're looking for, and we've stopped receiving
6  complaints.'"  Did you make this statement?
7  A    Yes, I did.
8  Q    Did you believe it to be accurate when you
9  made it?
10 A    I did.
11 Q    All right.  In a moment I will hand you what
12 I'll ask the court reporter to mark as Exhibit 2.
13           (Exhibit No. 2 marked.)
14 Q    BY MS. LEE:  This is a copy of U.S. patent number
15 5,675,819 which I am going to call the 819 patent.
16 The document bears production numbers GGL0005768
17 through 96.  Mr. Smith, have you ever seen the 819
18 patent before?
19 A    I have not.
20 Q    Do you know what -- the invention that's
21 claimed in the 819 patent?
22 A    I don't.
23 Q    Did you do anything to prepare for the
24 deposition today?
25 A    Since I believe that I was identified because

COMPUTER UNCERTIFIED ROUGH-DRAFT TRANSCRIPT ONLY

1  of the case study, I went and looked up the case

2  study on the web and determined approximately when

3  the product mentioned was introduced.  And I

4  consulted with our corporate counsel.

5  Q    Did you review any other documents --

6  A    I did not.

7  Q    -- to prepare for this deposition?  Did you

8  bring any notes with you today to the deposition?

9  A    No.

10  Q    And you mentioned that you communicated with

11  Xerox corporate counsel; is that right?

12  A    Yes.

13  Q    Who was it at Xerox corporate counsel you

14  communicated with?

15  A    I went through a number of folks.  There

16  was -- our group is, because we're a corporate

17  group, there is -- our first line of contact is an

18  attorney in our corporate office in Stanford.  She

19  referred me to Lou Faber, who referred me to

20  another colleague, who referred me to Manny Kiogi

21  (phonetic), who involved Kristin.

22  Q    So you had a series of conversations?

23  A    I did.

24  Q    What did you discuss with them, generally,

25  without revealing any privileged communication?

1  A    How the deposition would work.

2  Q    And about how long did these conversations

3  last?

4  A    I think the longest one was ten or 15 minutes.

5   Q    Do you recall when, generally, these

6   conversations occurred?

7   A    The conversation with Kristin and Manny, which

8   was the most substantive, was I believe either

9   Monday or Tuesday of this week.

10  Q    And have you communicated with anyone else

11  regarding your deposition today?

12  A    Mentioned to some colleagues that I would be

13  testifying.

14  Q    Have you communicated with anyone about this

15  case, generally?

16  A    No.

17  Q    Have you discussed -- aside from your

18  communications with Xerox corporate counsel and

19  your colleagues, have you discussed this lawsuit

20  with anyone else at Xerox?

21  A    No.

22  Q    Have you discussed this present lawsuit with

23  anyone at plaintiff's, IP Innovation?

24  A    No.

25  Q    Or Technology Licensing Corporation?

1   A    No.

2   Q    How about plaintiff's counsel, the Niro law

3   firm?

4   A    No.

5   Q    Have they reached out to you?

6   A    No.

7   Q    Have you had any past business dealings with

 8  the plaintiffs?

 9  A    I provided information for discovery in a

10  patent suit for Xerox.  I don't know if it was the

11  same plaintiff or not.

12  Q    Do you recall when you provided this

13  information?

14  A    Roughly two to three years ago.

15  Q    But you're not sure if this is the plaintiffs

16  in this case?

17  A    I am not.

18  Q    And you don't hold any positions with

19  plaintiffs, IP Innovation or Technology Licensing

20  Corporation?

21  A    I do not.

22  Q    Has anyone asked for your opinion about

23  whether Google infringes any IP Innovation's or

24  Technology Licensing Corporation's patents?

25  A    No.

    COMPUTER UNCERTIFIED ROUGH-DRAFT TRANSCRIPT ONLY
□
                                                      26


 1              MS. LEE:  That's all the questions I

 2  have for you today.

 3  A    Okay.

 4              MS. LEE:  Thank you, Mr. Smith.

 5              THE VIDEOGRAPHER:  This marks the

 6  end of the deposition of Chris Smith.  This is

 7  video one, volume one.  And we're going off the

 8  record at 9:27 a.m.  Please stand by.

 9              (DEPOSITION ADJOURNED AT 9:28 A.M.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

COMPUTER UNCERTIFIED ROUGH-DRAFT TRANSCRIPT ONLY